UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
ADVANCED MARKETING GROUP, INC.,        :

               Plaintiff,        :

                        :

   - against -        :

                        :

BUSINESS PAYMENT SYSTEMS, LLC,        :

                        :

             Defendant.        :
--------------------------------x

05 Civ. 9121 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

## I. BACKGROUND

By Order dated December 10, 2012, Magistrate Judge Frank Maas, to whom this matter had been referred for supervision of pretrial proceedings, issued an a Corrected Report and Recommendation (the "Report"), a copy of which is attached and incorporated herein, finding that plaintiff Advanced Marketing Group, Inc. ("AMG") had failed to establish with reasonable certainty its entitlement to damages in this action. But the Report recommended that judgment be entered in favor of AMG against defendant Business Payment Systems LLC, in the uncontested amount of $79,930.61. AMG filed timely objections to the Report challenging its findings and conclusions. For the reasons stated below, the Court adopts the recommendation of the Report in its entirety.

## II. STANDARD OF REVIEW

A district court evaluating a magistrate judge's report may adopt those portions of the report to which no "specific, written objection" is made, as long as the factual and legal bases

supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law.  Fed. R. Civ. P. 72(b); see also Thomas v. Arn, 474 U.S. 140, 149 (1985); Greene v. WCI Holding Corp., 956 F. Supp. 509, 513 (S.D.N.Y. 1997).  "Where a party makes a 'specific written objection ... after being served with a copy of the [magistrate judge's] recommended disposition,' however, the district court is required to make a de novo determination regarding those parts of the report."  Cespedes v. Coughlin, 956 F. Supp. 454, 463 (S.D.N.Y. 1997) (citing United States v. Raddatz, 447 U.S. 667, 676 (1980)); Fed. R. Civ. P. 72(b). The Court is not required to review any portion of a magistrate judge's report that is not the subject of an objection.  See Thomas, 474 U.S. at 149.  A district judge may accept, set aside, or modify, in whole or in part, the findings and recommendations of the magistrate judge as to such matters.  See Fed. R. Civ. P. 72(b); DeLuca v. Lord, 858 F. Supp. 1330, 1345 (S.D.N.Y. 1994).

### III.  **DISCUSSION**

Having conducted a de novo review of the full factual record in this litigation, including the pleadings, and the parties' respective papers submitted in connection with the underlying matter and the transcript of the hearing on damages before Magistrate Judge Maas, and the filings in this proceeding, as well as the Report and applicable legal authorities, the Court concludes that the findings, reasoning, and legal support for the recommendation made in Report are not clearly erroneous or contrary to law and are thus warranted.

-2-

Accordingly, for substantially the reasons set forth in the Report the Court adopts the Report's factual and legal analyses and determinations, as well as its substantive recommendation, in their entirety as the Court's ruling on the underlying issue of AMG's damages in this litigation.

### IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Report and Recommendation of Magistrate Judge Frank Maas dated December 10, 2012 (Docket No. 95) is adopted in its entirety, and the objections (Docket No. 94) of plaintiff, Advanced Marketing Group, Inc. ("AMG") are DENIED.

The Clerk of Court is directed to enter judgment in favor of AMG and in against defendant Business Payment Systems, LLC in the amount of $79,930.61, and to close this case.


**SO ORDERED.**

Dated:      NEW YORK, NEW YORK
            3 January 2013


                              Victor Marrero
                                 U.S.D.J.

ADVANCED MARKETING GROUP, INC.
v.
BUSINESS PAYMENT SYSTEMS, LLC

05 Civ. 9121

Report and Recommendation of
Magistrate Judge Frank Maas
dated December 10, 2012

Attachment to the Court's
Decision and Order
dated January 3, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

ADVANCED MARKETING GROUP, INC.,     :

                       Plaintiff,     :

      -against-     :

BUSINESS PAYMENT SYSTEMS, LLC,     :

                   Defendant.     :

---------------------------------------------------------x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:__12/10/12__

**CORRECTED
REPORT AND
RECOMMENDATION
TO THE HONORABLE
VICTOR MARRERO**

05 Civ. 9121 (VM) (FM)

**FRANK MAAS,** United States Magistrate Judge.

As Your Honor will recall, this case has a somewhat convoluted history, which includes a trip to the Court of Appeals. In its complaint ("Complaint" or "Compl."), filed in 2005, plaintiff Advanced Marketing Group, Inc. ("AMG"), claimed that defendant Business Payment Sytems, LLP ("BPS"), breached an agreement which required, among other things, that BPS remit to AMG seventy-five percent of certain fees collected by BPS. After BPS's counsel withdrew from the case, Your Honor directed that a default judgment in the amount of $2,094,869.48 be entered against BPS. (ECF No. 67). The Clerk of the Court entered that judgment on October 12, 2010. (ECF No. 72).

The day before judgment was entered, third-party Merchant Capital Portfolios LLC ("MCP"), which had acquired certain of BPS's assets, filed an "emergency" motion seeking to set aside the judgment. (ECF No. 68). Your Honor denied that motion, but referred the case to me because there was a discrepancy between the more than $2 million that AMG sought as a consequence of BPS's default and its

counsel's earlier representation to me, on March 2, 2010, that the case involved "[i]n excess of seventy-five thousand," and "[c]loser to seven hundred and fifty thousand" dollars. (See Mar. 2, 2010 Tr. at 8) (annexed as Ex. F to ECF No. 71 (Decl. of Mitchell C. Shapiro, Esq., dated Oct. 8, 2010)). Following the referral, I held an evidentiary hearing on January 21 and March 3, 2011, after which I entertained post-hearing submissions. For the reasons set forth below, I now recommend that AMG be awarded $79,930.61, plus prejudgment interest at the rate of nine percent per annum.

I.    Factual Background[1]

      A.    Introduction

BPS is no longer in business. While it was a going concern, BPS operated as an Independent Sales Organization ("ISO") marketing credit card processing services to merchants who would enter into contracts with a third party, National Processing Company ("NPC"), that actually provided the services. As Your Honor previously explained, BPS thus played a role akin to that of a real estate agent, bringing two contracting parties together in exchange for a fee. See Advanced Mktg. Group v. Business Payment Sys., LLC, 269 F.R.D. 355, 356-57 (S.D.N.Y. 2010). BPS, in turn, contracted with organizations such as AMG (sub-ISOs) that would refer merchants to BPS so that they could sign with NPC. Id. at 357.

---

[1]    Because there were certain gaps in the testimony of the hearing witnesses, I have at times referred to the parties' other submissions to complete the record.

The marketing agreement between AMG and BPS ("Contract"), although not a model of clarity, provided that, in exchange for its efforts, AMG would receive a percentage of the fees, known in the industry as "residuals," that BPS received from NPC. (Contract ¶ 5).[2]  AMG, in turn, relied on yet another subcontractor, known at different times as Maximum Research or Business Payment Systems WorldWide, to locate merchants requiring processing services.  (H. 9, 92; Compl. ¶ 30).[3]  (To avoid confusion, I will refer to this entity as "MR").  AMG's arrangement with MR provided that a percentage of the residuals that AMG received would trickle down to MR.

The initial term of the Contract was three years, but there was an evergreen clause which stated that it would "automatically renew for successive two-year terms," unless a party terminated it in writing within a window period.  (Contract § 11.1).  Additionally, the Contract required BPS to pay AMG certain specified residuals "on a lifetime basis" as long as each merchant continued to process its credit card business through BPS.  (Id. Schedule B).  Schedule B of the Contract further stated that:

> **In the case that BPS decides to sell any portion of the company's portfolio, AMG will be entitled to 50% of the sale price received by BPS on any of their accounts that were included in the sale.  Full accounting of the sale would be provided to AMG.**

(Id.) (boldface in original).

---

[2]      The Contract is Exhibit A to the affidavit of Michael Wiener, sworn to on September 14, 2010 (ECF No. 62) ("Wiener Aff.").

[3]      "H." refers to the hearing transcript.

3

The Contract also contained two addenda.  The first addendum, dated the same day as the Contract, somewhat confusingly provides that AMG will receive, among other payments, "monthly residuals of 50% override on all retail and Mail Order Accounts that are submitted and processing with NPC," as well as "all residual streams funded by NPC to BPS." (Contract at 18).  The second addendum, dated May 16, 2002 ("Addendum 2"), extends the term of the Contract for three years. (Id. at 19).  Addendum 2 further provides that "BPS [a]grees to pay [AMG] 75% of revenues received by BPS including all monies received on equipment and all monies received on residuals." (Contract, Addendum 2 ¶ 4).  In return, pursuant to Addendum 2, AMG agreed to change its "DBA name to Business Payment Systems Tri State" (although the Addendum indicates that this name was merely an "example"). (Id. ¶ 3).  AMG further agreed to "supply BPS with 100 accounts monthly on or about January 2003 and 200 accounts on or about January 2004."[4] (Id. ¶ 5).

In the First Cause of Action in its Complaint, AMG alleged that, pursuant to the Contract, AMG was entitled to "75 percent of the residuals generated by its customers and BPS retained 25 percent of these fees." (Compl. ¶ 22).  AMG further alleged that BPS breached this term of the Contract by unilaterally reducing AMG's share of the residuals from seventy-five to sixty, and later fifty-five, percent. (Id. ¶¶ 23, 24).

---

[4]    The typed text of Addendum 2 indicates "300 accounts" as the target level for January 2004, but was changed to "200 accounts" by hand.  None of the signatories to the Addendum initialed this change.

4

In its Second Cause of Action, AMG further alleged that it was entitled to receive "[s]eventy-five percent of the residuals earned on the MR [c]ustomers" so that it, in turn, could pay "50% of those residuals to MR." (Id. ¶ 32). AMG alleged that BPS breached this provision of the Contract in June 2003 by stopping any further payments of the residuals attributable to MR and paying those residuals instead directly to MR. (Id. ¶ 33). Indeed, BPS paid no residuals whatsoever to AMG after July 2004. (H. 40; Wiener Aff. ¶ 7).

In late October 2009, BPS entered into a Novation Agreement with MCP, at the behest of RBL Capital Group LLC ("RBL"), a lender that had declared certain of its loans to BPS to be in default. (See Wiener Aff. Ex. E) ("Novation Agreement"). Pursuant to the Novation Agreement, in order to "buy . . . peace," BPS agreed to assign all of its merchant accounts to MCP, in exchange for MCP's agreement to assume BPS's indebtedness to RPL. (Id. at 1-3). As a consequence, BPS itself received no further residual income attributable to the AMG or MR accounts in or after November 2009.

**B.**     Parties' Dueling Damages Presentations

At the hearing, each side presented only one witness. Michael J. Wiener, the president and chief executive officer of AMG, testified on its behalf. (H. 6-123). The sole defense witness was Yeruchem Blesofsky, who held a number of positions at BPS,

5

where, most recently, he was in charge of portfolio management and payments to BPS agents and sales representatives such as AMG. (Id. at 127-257).[5]

### 1.    Wiener Testimony

Mr. Wiener testified that after BPS stopped paying residuals to AMG, AMG did not submit any new accounts to BPS. Nevertheless BPS continued to send monthly residual reports to AMG through June 2004. (H. 40). From at least February 2004, however, those reports indicated that AMG was not entitled to any residuals for the merchant accounts that it had introduced to BPS through MR. (Id. at 46). Prior to the termination of those residual payments, MR accounted for somewhere between "60 to 75 percent" of the merchants that AMG had introduced to NPC through BPS. (Id. at 52).

Because AMG did not have any statistics regarding the attrition rate of all of its former accounts after it stopped receiving residual reports, Mr. Wiener examined the reports furnished by BPS for September through November 2004, from which he concluded that the account attrition rate had been approximately three percent per annum. (Id. at 49, 52-53). Mr. Wiener also determined that the attrition rate for accounts that he had introduced to Cynergy, a "comparable" ISO, was three percent. (Id. at 50; Wiener Aff. ¶ 8).

---

[5]        After the hearing, BPS made certain further submissions, including an affidavit in which Mr. Blesofsky "refined" the damages analysis that he previously had presented during his testimony. (See ECF No. 90 (Affidavit of Yeruchem Blesofsky, sworn to on Apr. 1, 2011) at 1). While I allowed additional "briefing" at the close of the hearing, (H. 258), I did not authorize any further testimony in the form of an affidavit or otherwise. I consequently have disregarded Mr. Blesofsky's post-hearing affidavit in the course of preparing this Report and Recommendation.

To estimate the contract damages that AMG sustained by reason of BPS's alleged breach, Mr. Wiener evidently assumed – at least for the period from 2005 through October 2009 – that the accounts that AMG had introduced to NPC through BPS would have earned residuals comparable to those that AMG earned through Cynergy. (Wiener Aff. ¶ 8 & Exs. C, D). Mr. Wiener further assumed that there would be a three percent per annum decline in the value of those accounts. (Id. ¶ 9 & Ex. D). Applying those assumptions (and perhaps others) to the 1,178 accounts that AMG allegedly had on the books of BPS before their relationship went asunder, Mr. Wiener concluded that AMG was wrongfully deprived of $1,354,998 in residuals over the period between the cessation of BPS's payments and the assignment of all of BPS's accounts to MCP. (Wiener Aff. ¶ 11; H. 55). Mr. Wiener further concluded that the prejudgment interest due and owing on each monthly payment that BPS should have made, calculated at the New York State nine percent statutory rate, see N.Y. Civ. Proc. L. and Rules § 5004, amounted to $594,169.90. (Wiener Aff. ¶ 21). Based on these calculations, AMG contends that it is entitled to recover a total of $1,929,167.90 by reason of BPS's failure to pay residuals to AMG. (Id.).

In addition to the unpaid residuals, AMG contends that it is owed a lump sum payment pursuant to the language in Schedule B of the Contract entitling it to fifty percent of any sums received by BPS through the sale of its accounts. Mr. Wiener testified that it was customary in the industry for credit card processing accounts to be sold at a multiple of eighteen or more times monthly residual earnings. (H. 57). He

7

based this conclusion, in part, on an article in "The Green Sheet," an industry publication, which indicated that one company was buying portfolios at multiples ranging from twelve to twenty-five times monthly residuals, and that another company had recently paid ten to twenty times the monthly residuals.  (See id.; Wiener Aff. ¶ 16 (citing Ken Musante, Variations on [V]aluations, The Green Sheet, at 54-57 (Issue 10:08:02 Aug. 23, 2010))).  On the assumption that AMG's residual stream, even after accounting for attrition, would have been $15,702.59 in October 2009, Mr. Wiener concluded that $282,646.62 ($15,702.59 x 18) of the sales price that BPS allegedly received was attributable to accounts introduced by AMG.  (Wiener Aff. ¶ 17).  Mr. Wiener contended that AMG therefore was entitled to recover an additional $141,323.31 ($282,646.62 x .50).  (Id. ¶ 18).  Mr. Wiener further calculated prejudgment interest on that sum at the statutory rate to be $24,378.27, yielding a total of $165,701.58 allegedly owed by BPS to AMG for the sale of the portfolio.  (Id. ¶ 22).

In sum, based on Mr. Wiener's presentation, AMG contends that, by virtue of BPS's default, it is entitled to recover $2,094,869.48 ($1,929,167.90 + $165,701.58).  (Id. ¶ 24).

## 2.    Blesofsky Testimony

Mr. Blesofsky testified that from 2007 to 2009, BPS was simultaneously "dealing with" portfolios that were processing through NPC and Cynergy.  (H. 137).  During that period, the Cynergy rate of attrition was about three percent; by comparison, between 2001 and 2009, the NPC attrition rate was over seventy percent, i.e., an annual

8

rate of approximately 7.7 percent. (Id. at 137-38, 140-42). Mr. Blesofsky attributed the substantially higher NPC attrition rate to changes in industry practices, which reduced the profitability of accounts "boarded" through NPC, thereby incentivizing sales representatives to move their accounts from NPC to other processors. (Id. at 138-40).

Mr. Blesofsky testified further that 360 of the accounts that AMG claimed were on BPS's books when the parties' relationship ceased had been introduced by AMG rather than MR or another entity. (Id. at 143-44). According to Mr. Blesofsky, ninety-two percent of those accounts ceased to do business through BPS by late 2009, a rate of attrition that he never previously had experienced during his thirteen years in the industry.[6] (Id. at 128, 144).

Mr. Blesofsky also testified that an additional 106 merchants for whom AMG was seeking damages "never belonged to AMG" because they were "direct agents" for BPS. (Id. at 147). Approximately 600 additional merchants were introduced through MR. (Id. at 155). According to Mr. Blesofsky, BPS began paying MR directly after MR complained that it was "not getting paid properly." (Id. at 157). Mr. Blesofsky contended that AMG therefore was seeking to recover residuals on behalf of MR that MR had already been paid. (Id. at 156).

Finally, Mr. Blesofsky testified that he had requested certain data from NPC, in the form of Excel spreadsheets, to enable him to determine the history of the

---

[6]      During his own testimony, Mr. Wiener conceded that AMG had moved certain accounts from NPC to Cynergy and other processors after 2004, but claimed not to know how many accounts were moved. (Id. at 78-80).

accounts that AMG and MR had introduced to NPC through BPS.  (Id. at 171-72).

Where the NPC data did not reflect an account closing date, Mr. Blesofsky assumed that

the account remained open until the transfer of the BPS portfolio of AMG/MR accounts

to MCP was complete.  (Id. at 174-75). On that assumption, Mr. Blesofsky concluded

(based on the NPC data) that the maximum residuals to which AMG was entitled for all

1,178 accounts, at a seventy-five percent reimbursement rate, would have been $200,000,

exclusive of prejudgment interest.  (Id. at 250-51).

  Mr. Blesofsky contended, however, that AMG was not entitled to recover

any residuals because AMG had failed to fulfill its obligations under the Contract,

through such actions as moving merchants boarded through NPC to other processors.  (Id.

at 206-07).

II. Discussion

  A. Sufficiency of Contract Claims

  To asssert a prima facie breach of contract claim under New York law,

AMG had to allege (1) the existence of a contract; (2) performance of its obligations

under the contract; (3) BPS's failure to perform its obligations thereunder; and (4)

damages. Eternity Global Masters Fund v. Morgan Guar. Trust Co. of N.Y., 375 F.3d

168, 177 (2d Cir. 2004); Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).  There is

no question that the Complaint in this action satisfies three of these four required

elements.  The only allegations with respect to AMG's performance, however, are that

"AMG, as an agent of BPS, provided customers . . . to NPC," and that "AMG . . .

10

provided the MR customers to BPS." (Compl. ¶¶ 20, 31). Although each element of a

contract action need not be separately pleaded, <u>Berman v. Sugo, LLC</u>, 580 F. Supp. 2d

191, 202 (S.D.N.Y. 2008), Addendum 2 to the Contract, upon which AMG bases its

contract claims, imposes several obligations on AMG, including "supply[ing] BPS with

100 accounts monthly on or about January 2003 and 200 accounts on or about January

2004." (Contract, Addendum 2 ¶ 5). The mere allegation that AMG supplied <u>some</u>

customers to NPC through BPS does not establish that AMG satisfied the quotas set forth

in the Contract, nor can it be read to suggest that AMG complied with all of its other

contractual duties.  While this defect might be curable if this case were proceeding in the

normal course, here AMG seeks to establish liability through BPS's default.  In that

procedural context, the failure to allege full performance on AMG's part is fatal to its

contract claims.  <u>See, e.g.</u>, <u>Syracuse v. Loomis Armored US, LLC</u>, No. 5:11 Civ. 00744

(MAD) (GHL), 2012 WL 88332, at *5 (N.D.N.Y. Jan. 11, 2012) ("Plaintiff's failure to

allege that it performed its own obligations under the contract, whatever they may be, is

sufficient to warrant dismissal of its breach of contract causes of action."); <u>Comfort Inn</u>

<u>Oceanside v. Hertz Corp.</u> No. 11 Civ. 1534 (JG), 2011 WL 5238658, at *3 (E.D.N.Y.

Nov. 1, 2011) ("A claimant's failure to plead the performance of its own contractual

obligations is fatal to a breach of contract claim even if the other requisite elements are

properly pleaded."); <u>Patel v. Baluchi's Indian Rest.</u>, No. 08 Civ. 9985 (RJS), 2009 WL

2358620, at *8 (S.D.N.Y. July 30, 2009) (granting dismissal but allowing plaintiffs to

amend to cure "technical" failure to "allege the satisfaction of the stated condition

precedent" to defendant's duty to perform); <u>Creditsights, Inc. v. Ciasullo</u>, No. 05 Civ. 9345 (DAB), 2008 WL 4185737, at *11 (S.D.N.Y. Sept. 5, 2008) ("Counterclaim [p]laintiff cannot make out a claim for breach of contract because [c]ounterclaim [p]laintiff does not allege adequately that he performed his obligations under the referenced contracts."); <u>Global Crossing Bandwidth, Inc. v. PNG Telecomm'ns, Inc.</u>, No. 06 Civ. 6415T, 2007 WL 174094, at *2 (W.D.N.Y. Jan. 22, 2007) ("While failure to plead [the performance element] of a cause of action may be a technical defect, it is nonetheless a defect, and accordingly defendant's motion to dismiss this cause of action is granted."); <u>Am. Nat'l Theatre and Academy v. Am. Nat'l Theater, Inc.</u>, No. 05 Civ. 4535 (JGK), 2006 WL 4882916, at *4 (S.D.N.Y. Sept. 27, 2006) (dismissing breach of contract claim for "fail[ure] to allege that [plaintiff] performed whatever obligations it had under the alleged contract").

Although the failure to plead performance appears dispositive of AMG's contract claims, MCP's motion to vacate the default judgment did not rely on the facial insufficiency of the Complaint. Accordingly, this argument may have been waived. Furthermore, in its summary order, the Second Circuit reversed Your Honor's prior order dismissing the AMG contract causes of action for failure to state a claim. In doing so, the court focused on a narrow question: "whether it was proper at the motion to dismiss stage to determine as a matter of law that AMG had not 'adequately performed' under the contract at issue and thus was not entitled to the relief it sought." <u>Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC</u>, 300 Fed. Appx. 48, 49 (2d Cir. 2008). The court noted

12

that the original Contract provided that residuals were to be paid to AMG on a "lifetime basis." Id. Addendum 2 later imposed certain minimum productivity requirements on AMG, but the court concluded that the motion to dismiss should not have been granted because the Contract failed to "unambiguously provide[] that if AMG did not meet its production requirements in full each month, AMG would lose residuals on all of the accounts it had previously provided to BPS." Id. While the court thus appears not to have focused on AMG's failure to plead full performance on AMG's part, as Eternity Global and Harsco require, its decision could be read as a declaration of the sufficiency of the Complaint. For these reasons, I will proceed to consider the parties' competing damages calculations.

      B.     Damages

           1.     Applicable Law

      At an inquest hearing, such as the one conducted in this case, a court must accept as true "all of the factual allegations of the complaint, except those relating to damages." Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981). Accordingly, to prevail with respect to its damages, a non-defaulting party must establish the amount of its damages with reasonable certainty. See, e.g., Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000). This means that the damages "must be 'capable of measurement based upon known reliable factors without undue speculation.'" Id. (quoting Ashland Mgt. Inc. v. Janien, 82 N.Y.2d 395, 403 (1993)).

2.    Lost Residuals

Mr. Wiener testified, in substance, that he attempted to estimate AMG's damages arising out of the unpaid residuals by adjusting the value of AMG's BPS portfolio to be consistent with changes in AMG's Cynergy portfolio and also assuming a three percent per annum attrition rate. (H. 48-60). Among the exhibits that AMG introduced to explain how Mr. Wiener went about this task were summaries of the actual residuals that AMG had earned on its allegedly "comparable" Cynergy portfolio and a chart projecting the results of applying his analysis to the latest residual data that BPS had furnished to AMG. (See Wiener Aff. ¶ 8, Exs. C, D). Mr. Wiener, however, neither explained the precise formulas that he used to make his projections nor provided any worksheets that would enable the Court to verify the accuracy of his analysis. Having reviewed the data upon which Mr. Wiener relied, and his conclusions therefrom, I find that his methodology was unreliable and does not estimate AMG's actual losses with reasonable certainty.

For example, from July 2006 to August 2006, the monthly Cynergy residual payments rose from $17,386.25 to $23,519.89, an increase of 35.278 percent. (See Wiener Aff. Ex. C at 2). During that same period, however, Mr. Wiener inexplicably concluded that AMG's residuals actually would have declined from $21,767.78 to $21,115.53, (see id. Ex. D at 1), a result that seems to reflect a three percent monthly decline in residuals. While this error works to BPS's advantage, it is scarcely the only error in AMG's computations.

14

As a further example, between February and March 2007, the Cynergy residuals increased by 1.39 percent from $18,284.69 to $18,538.90. (Id. Ex. C at 3). Applying that percentage increase to the February 2007 projected residuals would have yielded projected residuals for March 2007 of $20,482.39, but AMG's chart indicates that the projected residuals for that month were $20,403.34, (see id. Ex. D at 1), a result which cannot be explained simply by reducing the initial projected amount by three percent. Even more troublesome is the fact that Mr. Wiener's calculations indicate that the projected residuals for certain paired months, such as January 2006 and January 2007, February 2006 and February 2007, and October 2006 and October 2007, were identical, even though the actual Cynergy residuals chart, upon which Mr. Wiener claimed to base his calculations, exhibits no similar symmetry.[7] (Compare id. Ex. C with id. Ex. D).

Additionally, while Mr. Wiener may have had to estimate the attrition rate for the MR accounts, AMG certainly knew which of its own accounts had been moved to other processors and when those transfers occurred. The decision to apply Cynergy's attrition rate to those accounts, rather than relying on AMG's own data, thus appears to have been an attempt to inflate AMG's damages.

Finally, in his calculations, Mr. Wiener sought to recover seventy-five percent of the residuals attributable to MR, (Wiener Aff. ¶¶ 4-5), even though AMG

---

[7]     According to AMG, the earnings of the AMG Cynergy residuals portfolio for these months were as follows: January 2006, $15,580.85; January 2007, $20,264.87; February 2006, $13,973.88; February 2007, $18,284.69; October 2006, $23,115.86; October 2007, $19,136.39. (Wiener Aff. Ex. C at 2-3).

concedes in its Second Cause of Action that (a) the practice was that fifty percent of those residuals would have been paid to MR, and (b) BPS "paid those residuals directly to MR." (Compl. ¶¶ 32, 33). Mr. Wiener made no attempt to calculate this set-off, (see H. 93), which obviously would have been substantial.

In sum, although a plaintiff in a contract action need only prove its damages with reasonable certainty, Mr. Wiener's projections concerning AMG's residuals do not appear to have been determined using a consistent methodology. Nor do his calculations appear to be accurate or consistent with the actual performance of the portfolio that AMG boarded through BPS. Accordingly, I am unable to recommend that they be adopted by the Court.

I am equally unable to determine the residuals to which AMG may be entitled on the basis of Mr. Blesofsky's testimony. The principal difficulty with Mr. Blesofsky's calculations is that they are not based on books and records that were shown to have been prepared or received by BPS in the ordinary course of its business. (H. 175-76). Instead, Mr. Blesofsky relied on certain Excel spreadsheets that an NPC employee surreptitiously furnished to him after this suit was filed. (Id. at 175, 190-93, 246). Although Mr. Blesofsky testified that BPS had received similar spreadsheets from NPC in the past and that he had verified the accuracy of the post-suit spreadsheets by comparing them to his own records, (id. at 171), no witness at the hearing testified as to their authenticity or that they were records kept in the ordinary course of business. It also appears that the business records underlying the spreadsheets—whether maintained at

16

BPS or NPC—were not made available for AMG's review prior to the hearing. (Id. at 150-52, 159, 220-24). In these circumstances, the NPC spreadsheets are not a basis upon which Mr. Blesofsky may rely in establishing AMG's lost residuals damages. See Fed. R. Evid. 803(6)(D) (providing, insofar as relevant, that business records must be authenticated by "the custodian or another qualified witness, or by a certification that complies with Rule 902(11)"); Fed. R. Evid. 1006 (proponent of a summary of voluminous writings must make the originals or duplicates of those writings "available for examination or copying, or both"); Fed. R. Civ. P. 37(c) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

> 3.   Portfolio Sales Proceeds

At the hearing, AMG also sought to recover damages pursuant to the provision of Schedule B of the Contract stating that AMG is entitled to fifty percent of any sums received by BPS through the sale of accounts attributable to AMG. (H. 56-61). As noted previously, relying on a multiple of eighteen times monthly residual earnings that he considered reasonable, Mr. Wiener opined that $282,646.62 of the amount that BPS received should have been attributable to the AMG accounts remaining on BPS's books as of October 2009, thereby entitling AMG to recover $141,323.31. (Id. at 59; Wiener Aff. ¶¶ 17-18).

17

There are two problems with this aspect of AMG's damages claim. First, Schedule B states that if "BPS decides to <u>sell</u> any portion of the company's portfolio, AMG will be entitled to 50% of the <u>sale price received</u> by BPS on any of their accounts that were included in the <u>sale</u>." (Contract Sch. B) (emphasis added; boldface omitted). Here, however, there was no sale and BPS received no monies as a consequence of its transfer of any AMG or MR accounts to MCP. Instead, as the Novation Agreement recites, the sole consideration that BPS received was MCP's agreement to assume BPS's indebtedness to its lender, RBL. (<u>See</u> Wiener Aff. Ex. E, at 3, <u>et seq.</u>). The transaction thus does not constitute a "sale" of BPS's accounts. Moreover, even if this three-party transaction were deemed to be a sale, Schedule B merely entitles AMG to recover half of the monies "received" by BPS. This transaction, however, was structured as a walk-away. Accordingly, because BPS received no monies from anyone, there were no proceeds for BPS to share with AMG.

Second, even if the transactions undertaken pursuant to the Novation Agreement were deemed to be a sale, and the forgiveness of debt were treated as the equivalent of a cash payment, AMG has sought to recover only unpaid residuals in this suit. The Complaint does not contain so much as a syllable suggesting that AMG also is seeking to recover any monies pursuant to the sale of "any portion of [BPS's] portfolio" in Schedule B. Accordingly, despite its default, BPS has never admitted that it owes any proceeds to AMG by virtue of the assignment of its accounts, and AMG is not entitled to recover any such proceeds as part of a default judgment. <u>Cf. Silge v. Merz,</u> 510 F.3d 157,

18

160 (2d Cir. 2007) (noting that Fed. R. Civ. P. 54(c) "permits neither increases 'in kind . .

. or . . . in amount' from the figure specified in the demand for judgment" in the

complaint).

III.        Conclusion

For the reasons set forth above, AMG has failed to establish with

reasonable certainty through admissible evidence its entitlement to any damages.

Nonetheless, in its post-hearing briefing, BPS states that it will not contest the entry of a

judgment in the amount of $79,930.61. (See ECF No. 78 (Decl. of Mitchell C. Shapiro,

Esq., dated Dec. 10, 2010) ¶ 20) (relying on ECF No. 79 (Affidavit of Yeruchem

Blesofsky, sworn to on Dec. 10, 2010) (assuming that AMG could recover only fifty

percent of receivables, plus prejudgment interest)). For this reason, although AMG has

failed to prove its damages adequately, I recommend that judgment be entered in favor of

AMG against BPS in the amount of $79,930.61. (Since it appears that BPS is no longer

in business, the only conceivable utility of this judgment will be as a setoff to any claims

that MCP may bring against AMG in BPS's name.)

Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Victor Marrero and to the chambers of the undersigned

at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Marrero. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:      New York, New York
            December 10, 2012

                                        _____
                                        / FRANK MAAS
                                        United States Magistrate Judge

Copies to All Counsel via ECF

20